## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

DANIEL NOVIN, STEWART SWANDER, )
TIMOTHY BUTLER, REID BEGNOCHE, )
DUSTIN BROWN, and JEFFREY ERKER, )
on behalf of themselves individually )
and all other similarly situated employees, )
                                             )
       *Plaintiffs*, )
                                             )
vs. )   Case No. 24-CV-0046
                                             )
JOHNSON CONTROLS, INC. )
Serve: Registered Agent )
      C T CORPORATION SYSTEM )
      301 S. Bedford Street, Suite 1 )
      Madison, WI 53703 )
                                             )
       *Defendant*. )

## CLASS ACTION COMPLAINT

For their Class Action Complaint, Daniel Novin, Stewart Swander, Timothy Butler, Reid Begnoche, Dustin Brown, and Jeffrey Erker, (the "Named Plaintiffs") on behalf of themselves individually and all other similarly situated employees of Defendant Johnson Controls, Inc. ("Johnson Controls"), by and through their attorneys, state as follows:

## INTRODUCTION

1.     The Named Plaintiffs bring this action in their individual capacities and on behalf of a class of similarly situated salespersons employed by Johnson Controls in connection with a new incentive plan that robs the Named Plaintiffs and the class of millions of dollars of incentives and commissions that Johnson Controls had previously agreed to pay them for contracts that the Named Plaintiffs procured and closed.

2. For the last couple of decades at least, Johnson Controls had paid incentives (*i.e.* commissions arising out of contracts that the salespersons closed) to its salespersons (of which the Named Plaintiffs are but a few) at generally regular intervals over the course of the project or contract at issue.

3. Under this system, the Named Plaintiffs would receive an initial commission payment of approximately 20-25% of the overall commission shortly after closing the contract. Over the life of the project, Johnson Controls would then pay the remaining 75-80% of the salespersons' commissions. In salesperson lingo, the portion of their commission remaining to be paid was referred to as a "backlog."

4. Over the years, the Named Plaintiffs accumulated substantial backlogs—ranging from a few thousand dollars to backlogs well into the six figures—of commissions or incentives that Johnson Controls had agreed to pay them over the course of various contracts and projects.

5. Under the payment plans in place prior to October 1, 2023, if a Named Plaintiff procured and closed a contract that called for customer payments to be made over the course of multiple fiscal years, Johnson Controls agreed to pay the Named Plaintiffs commissions or incentives under the payment plan in effect <u>at the time the contract was closed</u>.

6. This "grandfathering" provision—as Johnson Controls called it—ensured that the Named Plaintiffs earned commissions or incentives on work that they performed commensurate with their expectations at the time the work was performed.

7. If the Named Plaintiffs closed a contract in 2021 that they expected to net them a total incentive of $10,000 over the course of the company's next two fiscal years, the grandfathering provision made sure that, even if Johnson Controls changed the overall payment plan for subsequent fiscal years, it was still agreeing to abide by the terms of the deal it had in

2

place when the sale was closed in 2021. With this grandfathering provision, the Named Plaintiffs had some assurance that Johnson Controls would abide by the terms of its incentive agreement and pay the salespersons the $10,000 commission (subject to adjustments) that the parties had contemplated when the contract had closed.

8.     This grandfathering provision also served to provide the Named Plaintiffs with some assurance as to their future salary. They understood that, while the timeframe within which they would receive their backlog might stretch over the course of several months or even years, they nonetheless could bank on a very high percentage of their accrued backlog being paid to them. Naturally, the Named Plaintiffs took their expected backlogs into their and their families' financial planning and futures.

9.     In November 2023, Johnson Controls announced that, though it was going to continue servicing the contracts and working on the projects under which billions of dollars in backlogs were due, and though it was planning on accepting payment from its customers for the billions of dollars in backlog that are owed, Johnson Controls was reneging on its promise to pay the Named Plaintiffs (and others similarly-situated) the incentives and commissions that made up the Named Plaintiffs' backlogs.

10.    Inexplicably, Johnson Controls removed the grandfathering provision that ensured a basic fairness in the commission structure under which the Named Plaintiffs and Johnson Controls operated. Johnson Controls will assuredly attempt to hold its customers to the project and service agreements that they signed, and the customers will continue to pay Johnson Controls billions of dollars in backlog that Johnson Controls and its shareholders will benefit from.

11.    However, because of the new FY24 incentive plan, the Named Plaintiffs—the salespersons who procured and closed the contracts at issue, and who earned the incentive or

commission attached to those contracts—will see none of their accrued backlog. Their financial futures are now in jeopardy.

12.     Accordingly, the Named Plaintiffs bring the various claims below—as individuals and on behalf of their fellow salespersons—to recover the millions of dollars of damage to them and their similarly-situated salespersons that Johnson Controls has caused.

## **PARTIES**

13.     Plaintiff Daniel Novin is employed as an Account Executive by Johnson Controls, a position he has held since 2011. Novin resides in Overland Park, Kansas, and works out of Johnson Controls' office in Lenexa, Kansas.

14.     Plaintiff Stewart Swander has been employed by Johnson Controls since March 2019 as a Field Sales Executive I. Swander resides in Olathe, Kansas, and works out of Johnson Controls' office in Lenexa, Kansas.

15.     Plaintiff Timothy Butler is employed as an Account Executive by Johnson Controls, a position he has held since approximately 2004. Butler resides in Overland Park, Kansas, and works out of Johnson Controls' office in Lenexa, Kansas.

16.     Plaintiff Reid Begnoche is employed as an Account Executive by Johnson Controls, a position he has held since 2013. Begnoche resides in Olathe, Kansas, and works out of Johnson Controls' office in Lenexa, Kansas.

17.     Plaintiff Dustin Brown is employed as an Account Executive by Johnson Controls, a position he has held since 2003. Brown resides in Nixa, Missouri, and works out of Johnson Controls' office in Springfield, Missouri.

4

18.     Plaintiff Jeffrey Erker is employed as an Account Executive by Johnson Controls, a position he has held since 1998. Erker resides in Chesterfield, Missouri, and works out of Johnson Controls' office in St. Louis, Missouri.

19.     While the Named Plaintiffs have and have had a range of job titles during their employment with Johnson Controls, they all perform similar jobs—selling equipment and projects to Johnson Controls' clients within their region.

20.     Defendant Johnson Controls, Inc. ("Johnson Controls," or "Defendant") is the United States-based subsidiary of Johnson Controls International, Inc. Johnson Controls maintains its principal place of business at 5757 N. Green Bay Avenue, Milwaukee, Wisconsin 53209. Johnson Controls can be served through its Registered Agent, C T Corporation System, at 301 S. Bedford Street, Suite 1, Madison, Wisconsin 53703.

## JURISDICTION AND VENUE

21.     The Named Plaintiffs bring class action claims for breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment, as well as claims for violations of various state wage payment statutes.

22.     This Court has original federal question jurisdiction over this prospective class action under 28 U.S.C. § 1332(d) because the sum in controversy exceeds $5,000,000 exclusive of interests and costs, the Named Plaintiffs and most of the prospective Class Members are citizens of a state different than Defendant Johnson Controls.

23.     The venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant is a resident of this judicial district, and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS

24.     Defendant Johnson Controls is a Wisconsin for-profit corporation. It is a subsidiary of Johnson Controls International, a multinational conglomerate based in Cork, Ireland with its North American headquarters in Wisconsin.

25.     Johnson Controls operates over 200 locations across the United States. It employs several hundred commissioned salespersons across the United States in positions substantially similar to the positions held by the Named Plaintiffs.

26.     At all relevant times, the Named Plaintiffs and all others similarly situated were commissioned salespersons employed by Defendant.

27.     Plaintiffs Novin, Swander, Butler, and Begnoche sell equipment and projects to Johnson Controls clients in the Kansas City district, which includes clients in both Kansas and Missouri.

28.     Plaintiff Brown sells equipment and projects to Johnson Controls clients in the Springfield, Missouri district.

29.     Plaintiff Erker sells equipment and projects to Johnson Controls clients in the St. Louis, Missouri district.

### *Sales Process*

30.     From the time a prospective client is identified, the process for the Named Plaintiffs of engaging a client, developing a proposal, and pitching and selling it to the client generally takes several months.

31.     Once a project is sold, the Named Plaintiffs hand the project off to Defendant's operations team to execute the project. At that point, the Named Plaintiffs' work on the project is largely complete, outside of answering the occasional client question.

6

32.     The process laid out above—from prospective client identification through sale and handing off of the project to the operations team—was and is the same for all of Defendant's commissioned salespersons, regardless of their specific job title, within its Fire, Security, and HVAC divisions.

***Historic Commission Structure and the "Backlog"***

33.     The Named Plaintiffs and all other similarly situated employees of Defendant operate under a commission sales incentive plan (the "Plan").

34.     From the time each of the Named Plaintiffs' respective employment periods began with Johnson Controls through the end of Defendant's fiscal year ending on September 30, 2023 ("FY23"), the Plan was slightly modified each year, but its general structure remained largely the same.

35.     Whenever one of the Named Plaintiffs completed a sale, he could expect to receive between 6.5% and 7.0% of the profit margin on that sale as commission, which Johnson Controls refers to as an "incentive."

36.     For example, if one of the Named Plaintiffs sold a $1 million project on which Johnson Controls made a $300,000 profit, the Named Plaintiff could expect to receive incentives (*i.e.*, commissions) between roughly $19,500 and $21,000 for that project.

37.     The Named Plaintiff would typically receive around 25% of the expected incentive on a project upon completion of the sale. In the above example, that initial payment would be between roughly $4,875 and $5,250.

38.     The remaining incentive—in the above example, between $14,625 and $15,750—was referred to as the salesperson's "backlog."

7

39.     The backlog for the Named Plaintiff was paid out over time as the operations team completed the project and the client paid for services rendered. Johnson Controls referred to these periodic payments as "Monthly Incentives."

40.     Payment to the salesperson of the final portion of the backlog—called the "Closeout Incentive"—on a given project was made at or shortly after the time the client made their final payment.

41.     At the time of this final payment, the backlog would be "trued up," such that the salesperson's total incentive on the project equaled the percentage of the profit margin set forth in the Plan. If a project went over or under on projected costs at the time of the sale, the final backlog payment could be smaller or larger than initially anticipated, respectively.

42.     Averaged out across projects, salespersons could and did expect to receive total incentive payments in an amount very close to their initially estimated backlog.

43.     The exact numbers and percentages above are only one example and may vary slightly across the company or year to year. However, the core facts of the above-described process of incentive calculation, accrual of the backlog, and payout over time applied equally to Plaintiff Novin, the other Named Plaintiffs, and to all other similarly situated employees of the Defendant within Defendant's Fire, Security, and HVAC divisions.

***Transition to the FY24 Commission Sales Plan***

44.     Prior to the rollover from FY23 to the Fiscal Year 2024 (October 1, 2023 – September 30, 2024, "FY24"), Johnson Controls had a practice of paying out its salespersons' backlog under the incentive plan that was effective in the year a sale was made.

45.     Johnson Controls referred to this practice as "Grandfathered' Contracts" and agreed, for example, in FY23, that "All open contracts secured prior to the effective date of this

8

plan [October 1, 2022] will not earn sales incentive under this Plan and will be paid in accordance with the plan in effect at time of booking." The same or similar language appears in prior versions of the Plan, dating back at least to FY16.

46.     For example, if a commissioned salesperson made a sale in FY21 and a portion of their incentive on that sale was backlogged (as was the case with the majority of contracts) and paid out over the course of the next two years (FY22 and FY23), that backlogged incentive was paid out under the terms of the FY21 Plan.

47.     Commissioned salespersons, including the Named Plaintiffs, could and did understand that part of their agreement with Johnson Controls was that they would be paid commissions under the Plan in effect the year a sale was made.

48.     Commissioned salespersons, including the Named Plaintiffs, could and did make significant financial and life decisions based on the expected payout of their backlogged commission over time in accordance with that agreement.

*Fiscal Year 2024 Plan*

49.     In November 2023, Johnson Controls announced the sales incentive compensation plan for FY24. The FY24 Plan was retroactive to October 1, 2023.

50.     The FY24 Plan completely overhauled the general commission system outlined above that had been in place, with only minimal tweaks, for several years. Defendant characterized the change as a "full sales incentive plan redesign."

51.     In particular, the FY24 Plan eliminates use of the backlog, shifting to a plan where commission is earned and paid out at the time a project is booked, rather than over time as the project is paid.

9

52. Unlike with Plan changes in previous years, Defendant unilaterally determined that commission for any sales made during previous years under prior versions of the Plan would *not* continue to be governed by the plans in effect at the time of the sale.

53. Instead, all sales, including those made prior to adoption of the FY24 Plan, would be governed by the FY24 Plan.

54. This new policy meant that salespersons' accrued backlog—which Johnson Controls had previously agreed to pay its salespeople over the time that the project took to complete—would no longer be paid out.

55. The accrued backlogs benefit Defendant, adding to Defendant's balance sheet and profit margin, unless and until they are paid out to the Named Plaintiff's and similarly situated commissioned salespersons.

56. The accrued backlogs were built through the hard work of the named Plaintiffs and others similarly situated.

57. Defendant previously recognized the commissioned salespersons' hard work by paying them their accrued backlogs as envisioned by the incentive compensation plans.

58. With the transition to the FY24 Plan and the accompanying decision to treat the backlogs as unearned and eliminate them, Defendant determined that it would retain the backlogs and keep and use that benefit for itself.

59. In its most recent Form 10-K, Johnson Controls represented that its backlog was $13.6 billion, and that "backlog is a useful measure of evaluating the Company's operational performance and relationship to total orders."

60.     In announcing the new plan, Johnson Controls represented that, "Sales booked prior to October 1, 2023, which have not reached the required milestones for commission eligibility are not earned or due for payment."

61.     As part of the FY24 Plan, and to apparently "assist" the Named Plaintiffs and those similarly situated with what Johnson Controls termed a "transition" to the new Plan, Johnson Controls made a "one time bridge payment" to its commissioned salespersons that was "not meant to substitute for unearned commissions" (*i.e.*, backlogs).

62.     When bridge payments were made in November 2023, the payments constituted 22% of their backlog for each of the Named Plaintiffs.

63.     On information and belief, all employees similarly situated to the Named Plaintiffs also received bridge payments equal to 22% of their accrued backlog.

### Backlog Information is Wiped from Employee Portals

64.     Shortly after the transition to the FY24 Plan was announced, several of the Named Plaintiffs began attempting to preserve information about their then-existing backlogs.

65.     Within a day or two of the announced change, however, they discovered that all information about their backlogs that had previously been in their employee portals had been wiped out and was no longer available.

66.     In addition, Defendant has not provided copies of the full FY23 Plan or FY24 Plan to its commissioned salespersons, even upon request by the employees. Instead, employees only have a slideshow presentation that claims to be a summary of the Plans.

67.     Since the transition to the FY24 Plan took effect on October 1, 2023, portions of the backlog for each Named Plaintiff would have been due to be paid out under the previously

operative Plans the backlogged incentives were accrued under. Those portions of the backlog have been retained by Defendant and not paid to the Plaintiffs.

*Johnson Controls Requires New Restrictive Covenant for Salespersons to Obtain Additional "Bridge" Payments in 2025 and 2026*

68.    Following its announcement that it was eliminating the backlogs that it had previously agreed to pay its salespersons—including the Named Plaintiffs and all that are similarly-situated to them—Johnson Controls received significant opposition to the new plan from its salespersons.

69.    In response to the backlash, in early December 2023, Johnson Controls offered two additional "bridge" payments to the Named Plaintiffs and all others similarly situated.

70.    The "Sales Bridge Retention Payment" program, as Johnson Controls called it, provided the Named Plaintiffs (and all others similarly situated) with "up to two additional bridge retention payments," one in June 2025 and another in June 2026.

71.    Each of the two payments offered under the Sales Bridge Retention Payment totaled 14% of the Named Plaintiffs' backlog.

72.    Receipt of these payments—in June 2025 and June 2026—was conditioned, in part, on the Named Plaintiffs remaining an "Active Employee" of Johnson Controls during the interim.

73.    Additionally, Johnson Controls conditioned receipt of this portion of the backlog on the Named Plaintiffs agreeing to "work[] diligently to perform his or her duties" through the retention period, to receive at least a "Meets Expectations" performance review, and to acknowledge being bound by a set of Terms and Conditions that contained, among other provisions: (a) a Non-Competition provision that sought to restrict the Named Plaintiffs for one year from leaving Johnson Controls and joining a competitive business; and (b) a Non-Solicitation provision that sought to preclude the Named Plaintiffs from recruiting any other Johnson Controls

12

employees from leaving the company, and more importantly, from soliciting the business of Johnson Controls' customers.

74.    Put differently, Johnson Controls conditioned receipt of the backlogs accrued in past fiscal years on the Named Plaintiffs and those similarly situated agreeing to continuing to work at Johnson Controls with additional restrictive covenants that would limit the Named Plaintiffs' ability to find work after they left Johnson Controls.

***Backlogs as of September 30, 2023***

75.    ***Novin.*** As of the end of FY23, Novin's backlog totaled $40,570.15. **Exhibit A**, which has been redacted, reflects the various contracts that Novin closed during prior fiscal years, the status of those contracts, the incentives that Johnson Controls had originally agreed to pay Novin for the project, and how much of those incentives had been paid to Novin as of September 30, 2023.

76.    As evidenced by Exhibit A, Novin's backlog encompasses contracts that Novin closed during the last few fiscal years, with many of the incentives remaining for prior fiscal years 2021 and 2022.

77.    As an example, on one contract (Contract No. 1N420172) that Novin closed in the Spring of 2021, his estimated total incentive earned under the Plan in place during that fiscal year was $4,786.49.

78.    As of September 30, 2023, Johnson Controls had only paid Novin a total of $3,424.82, leaving a "remaining incentive" of $1,360.67—over 28% of the promised commission for the project—for that project that Johnson Controls had agreed to pay Novin as the project made its way to completion.

79.     On information and belief, Johnson Controls will continue to receive payments from its customers on the contracts after October 1, 2023 reflected on Exhibit A that, in prior fiscal years, would have then been paid to Novin as an incentive.

80.     ***Swander.*** As of the end of FY23, Swander's backlog totaled $66,608.88. **Exhibit B**, which has been redacted, reflects the various contracts that Swander closed during prior fiscal years, the status of those contracts, the incentives that Johnson Controls had originally agreed to pay Swander for the project, and how much of those incentives had been paid to Swander as of September 30, 2023.

81.     As evidenced by Exhibit B, Swander's backlog encompasses contracts that Swander closed during the last few fiscal years, with many of the incentives remaining for prior fiscal years 2021 and 2022.

82.     As an example, on one contract (Contract No. 1N420365) that Swander closed in the Fall of 2021, his estimated total incentive earned under the Plan in place during that fiscal year was $5,279.20.

83.     As of September 30, 2023, Johnson Controls had only paid Novin a total of $3,825.98, leaving a "remaining incentive" of $1,453.22—over 27.5% of the promised commission for the project—for that project that Johnson Controls had agreed to pay Swander as the project made its way to completion.

84.     On information and belief, Johnson Controls will continue to receive payments from its customers on the contracts after October 1, 2023 reflected on Exhibit B that, in prior fiscal years, would have then been paid to Swander as an incentive.

85.     ***Butler.*** As of the end of FY23, Butler's backlog totaled $65,814.69. **Exhibit C**, which has been redacted, reflects the various contracts that Butler closed during prior fiscal years,

the status of those contracts, the incentives that Johnson Controls had originally agreed to pay Butler for the project, and how much of those incentives had been paid to Butler as of September 30, 2023.

86.     As evidenced by Exhibit C, Butler's backlog encompasses contracts that Butler closed during the last few fiscal years, with many of the incentives remaining for prior fiscal years 2021 and 2022.

87.     As an example, on one contract (Contract No. 1N420145) that Butler closed in the Fall of 2021, his estimated total incentive earned under the Plan in place during that fiscal year was $11,070.53.

88.     As of September 30, 2023, Johnson Controls had only paid Butler a total of $8,079.95, leaving a "remaining incentive" of $2,990.58—over 37% of the promised commission for the project—for that project that Johnson Controls had agreed to pay Butler as the project made its way to completion.

89.     On information and belief, Johnson Controls will continue to receive payments from its customers on the contracts after October 1, 2023 reflected on Exhibit C that, in prior fiscal years, would have then been paid to Butler as an incentive.

90.     ***Begnoche.*** As of the end of FY23, Begnoche's backlog totaled $63,688.32. **Exhibit D**, which has been redacted, reflects the various contracts that Begnoche closed during prior fiscal years, the status of those contracts, the incentives that Johnson Controls had originally agreed to pay Begnoche for the project, and how much of those incentives had been paid to Begnoche as of September 30, 2023.

91.    As evidenced by Exhibit D, Begnoche's backlog encompasses contracts that Begnoche closed during the last few fiscal years, with many of the incentives remaining for prior fiscal years 2021 and 2022.

92.    As an example, on one contract (Contract No. 2N420383) that Begnoche closed in the Summer of 2022, his estimated total incentive earned under the Plan in place during that fiscal year was $14,518.50.

93.    As of September 30, 2023, Johnson Controls had only paid Begnoche a total of $12.793.68, leaving a "remaining incentive" of $1.724.82—almost 12% of the promised commission for the project—for that project that Johnson Controls had agreed to pay Begnoche as the project made its way to completion.

94.    On information and belief, Johnson Controls will continue to receive payments from its customers on the contracts after October 1, 2023 reflected on Exhibit D that, in prior fiscal years, would have then been paid to Begnoche as an incentive.

95.    ***Brown.*** As of the end of FY23, Brown's backlog totaled $71,119.74. **Exhibit E**, which has been redacted, reflects the various contracts that Brown closed during prior fiscal years, the status of those contracts, the incentives that Johnson Controls had originally agreed to pay Brown for the project, and how much of those incentives had been paid to Brown as of September 30, 2023.

96.    As evidenced by Exhibit E, Brown's backlog encompasses contracts that Brown closed dating back to fiscal year 2020.

97.    As an example, on one contract (Contract No. 0N570057) that Brown closed in 2020, his estimated total incentive earned under the Plan in place during that fiscal year was $10,227.47.

16

98.     As of September 30, 2023, Johnson Controls had only paid Brown a total of $7,552.26, leaving a "remaining incentive" of $2,675.21—over 26% of the promised commission for the project—for that project that Johnson Controls had agreed to pay Brown as the project made its way to completion.

99.     On information and belief, Johnson Controls will continue to receive payments from its customers on the contracts after October 1, 2023 reflected on Exhibit E that, in prior fiscal years, would have then been paid to Brown as an incentive.

100.     *Erker.* As of the end of FY23, Erker's backlog totaled $176,626.38. **Exhibit F**, which has been redacted, reflects the various contracts that Erker closed during prior fiscal years, the status of those contracts, the incentives that Johnson Controls had originally agreed to pay Erker for the project, and how much of those incentives had been paid to Erker as of September 30, 2023.

101.     As evidenced by Exhibit F, Erker's backlog encompasses contracts that Erker closed during the last few fiscal years, with many of the incentives remaining for prior fiscal years 2021 and 2022.

102.     As an example, on one contract (Contract No. 2N100139) that Erker closed in early 2022, his estimated total incentive earned under the Plan in place during that fiscal year was $30,082.02.

103.     As of September 30, 2023, Johnson Controls had only paid Novin a total of $10,520.01, leaving a "remaining incentive" of $19,562.01—over 65% of the promised commission for the project—for that project that Johnson Controls had agreed to pay Erker as the project made its way to completion.

17

104.    On information and belief, Johnson Controls will continue to receive payments from its customers on the contracts after October 1, 2023 reflected on Exhibit F that, in prior fiscal years, would have then been paid to Erker as an incentive.

***Class Allegations***

105.    Plaintiffs bring all counts as a class action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23. The Nationwide Class that the Named Plaintiffs seek to represent is composed of and defined as follows:

> "All individuals currently or formerly employed by Defendant Johnson Controls as commissioned salespersons with accrued backlogs who were employed at the time of the transition from the Fiscal Year 2023 Commission Sales Incentive Plan to the Fiscal Year 2024 Commission Sales Incentive Plan."

106.    Plaintiffs also bring state statutory claims under Kansas and Missouri law, on behalf of themselves individually and others similarly situated. They seek to represent sub-classes of the above-defined Nationwide Class consisting of members of the Nationwide Class who are employed in Kansas and Missouri, respectively.

107.    **Numerosity.**    Johnson Controls employs several hundred commissioned salespersons across the United States at any given time, including at the time of the transition between the FY23 and FY24 Plans. Class members are therefore far too numerous to be individually joined in this lawsuit.

108.    **Existence and Predominance of Common Questions.** Common questions of law and/or fact exist as to the members of the Class, and common questions of law and/or fact predominate over any questions affecting only individual members of the Class. The common questions include the following:

> a.    Whether members of the Nationwide Class had a contract with Defendant for payment of commissions according to the Plan under which they sold Defendant's products and services;

18

b.     Whether Defendant breached its contract with the Class Members when it refused to pay commissions according to the Plan under which its commissioned salespersons sold Defendant's products and services;

c.     Whether Defendant breached the covenant of good faith and fair dealing by eliminating the "Grandfathered' Contracts" provision that ensured that the Named Plaintiffs' incentives accrued under prior years' payment plans would, in fact, be paid out to them under subsequent payment plans, such as FY24;

d.     Whether Defendant's decision to retain the backlogs of its commissioned salespersons for itself has caused Defendant to be unjustly enriched by enjoying the benefit of labor for which it did not pay; and

e.     Whether the Named Plaintiffs and the Class are entitled to damages and/or equitable relief, including but not limited to restitution, disgorgement, and a preliminary and/or permanent injunction, and if so, the proper measure and formulation of such relief.

109.     **Typicality.** The Named Plaintiffs' claims are typical of the claims of the Class. Defendant's common course of conduct and violations of law alleged herein has been taken as to each Class Member and has caused the Class to sustain the same or similar injuries and damages. Plaintiffs' claims are thereby representative of and coextensive with the claims of the proposed class.

110.     **Adequacy.** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this class action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of members of the Class.

111.     **Superiority.** The class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each member of the Class, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual claims against Defendant economically feasible. Individualized litigation increases the

19

delay and expense to all parties and the court system presented by the legal and factual issues in this case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

112. In the alternative, the Class may be certified because: (a) the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class, which would establish incompatible standards of conduct for Johnson Controls; and (b) Johnson Controls has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

## COUNT I – BREACH OF CONTRACT

113. The Named Plaintiffs repeat the allegations above as if fully set forth herein.

114. Defendant established a valid, enforceable contact with the Named Plaintiffs and all those similarly situated such that in exchange for the salespersons selling Defendant's goods and services to its clients, Defendant would pay the commissioned salespersons a commission or incentive according to the Commission Sales Incentive Plan effective at the time the sale was booked.

115. In November 2023, Defendant modified the Commission Sales Incentive Plan, for FY24, retroactive to October 1, 2023.

116. Since October 1, 2023, commissions have come due on sales made under older versions of the Commission Sales Plan. Commissions will continue to come due under older versions of the Plan going forward as well.

117.   Defendant has breached the contract by failing to pay commissions to its commissioned salespersons according to the Plan under which those sales were made.

118.   As a direct and proximate result of Defendant's breach, the Named Plaintiffs and all those similarly situated have suffered and will continue to suffer economic loss.

119.   Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

**COUNT II – BREACH OF THE IMPLIED DUTY OF
GOOD FAITH AND FAIR DEALING**

120.   The Named Plaintiffs repeat the allegations above as if fully set forth herein.

121.   Defendant established a valid, enforceable contact with the Named Plaintiffs and all those similarly situated such that in exchange for the salespersons selling Defendant's goods and services to its clients, Defendant would pay the commissioned salespersons a commission or incentive according to the Commission Sales Incentive Plan effective at the time the sale was booked.

122.   This employment contract between the Named Plaintiffs and Johnson Controls implies good faith and fair dealing between the parties, as well as a duty of cooperation on the part of both parties to the contract.

123.   By eliminating the backlog and wiping out the incentives that the Named Plaintiffs had accrued under past incentive and commission plans, Johnson Controls has acted in bad faith and in violation of the implied covenant of good faith and fair dealing that is binding on both parties to the contract.

124.   The Named Plaintiffs have, in good faith, performed their obligations under the employment contracts that they have with Johnson Controls.

125.    As a result of Johnson Controls' breach of this implied covenant, the Named Plaintiffs and all others similarly situated have suffered damages in an amount to be determined at trial.

## COUNT III – UNJUST ENRICHMENT

126.    The Named Plaintiffs repeat the allegations above as if fully set forth herein.

127.    The Count is pled in the alternative to Counts I and II, in the event the Court determines a contract between the Parties does not exist or cover all of the Named Plaintiffs' claims.

128.    The Named Plaintiffs and all others similarly situated provided good and valuable services to Johnson Controls, engaging customers on their need for Defendant's products and selling Defendant's goods and services, all of which contributed to the financial success of Johnson Controls.

129.    The Named Plaintiffs and all others similarly situated provided these services based on the reasonable expectation that they would be compensated fairly and in accordance with the Plan in effect when they performed the work necessary to make the sale.

130.    Johnson Controls knowingly accepted and appreciated the benefits of the services performed by the Named Plaintiffs and all others similarly situated.

131.    Johnson Controls is now attempting to retain for itself millions of dollars in backlogged commissions that were secured by the hard work of the Named Plaintiffs and those similarly situated, who at the time of the work, had been told by Johnson Controls that they would receive the backlogged commissions in the normal course of the projects.

132.    Under the circumstances, it would be inequitable for Johnson Controls to retain those backlogged commissions without providing compensation to the Named Plaintiffs and all others similarly situated.

## COUNT IV – KANSAS WAGE PAYMENT ACT (Brought by Plaintiffs Novin, Swander, Butler, and Begnoche on behalf of a Sub-Class of Kansas Employees)

133.    Plaintiff Novin, Swander, Butler, and Begnoche repeat the allegations above as if fully set forth herein.

134.    Defendant Johnson Controls is the employer of Plaintiffs Novin, Swander, Butler, Begnoche and those similarly situated under Kansas law.

135.    K.S.A. § 44-314(a) requires employers such as Defendant to pay their employees, including Novin, Swander, Butler, and Begnoche "all wages due to the employees of the employer at least once during each calendar month."

136.    The Plaintiffs' backlogged commissions constitute wages due to the employees under Kansas law that Johnson Controls has agreed to pay.

137.    Defendant has willfully failed to pay the backlogged commissions as wages as they agreed.

138.    Under K.S.A. § 44-315(b), Defendant is liable to Plaintiffs for the unpaid wages and a penalty of 1% per day up to an amount equal to 100% of the unpaid wages.

## COUNT V – MISSOURI WAGE PAYMENT LAW (Brought by Plaintiffs Brown and Erker on behalf of a Sub-Class of Missouri Employees)

139.    Plaintiffs Brown and Erker repeat the allegations above as if fully set forth herein.

140.    Plaintiffs Brown, Erker, and those similarly situated are sales representatives of Defendant under Missouri law.

141. The written terms of a contract govern when commission payments come due in Missouri. Mo. Rev. Stat. § 407.912.1.

142. Under the terms of the Missouri Plaintiffs' contracts with Johnson Controls, commission payments from the sales representatives' backlogs have come due since October 1, 2023, and continue to come due every month going forward.

143. Defendant has failed and continues to fail to pay the Missouri Plaintiffs' commissions under the terms of their contracts.

144. Under Mo. Rev. Stat. § 407.913, Defendant is liable to the Missouri Plaintiffs and the Sub-Class of Missouri employees for actual damages sustained, an additional amount as if the sales representative were still earning commission on an annualized pro rata basis, and attorneys' fees and costs incurred in bringing this action.

## **PRAYER FOR RELIEF**

WHEREFORE, the Named Plaintiffs, on behalf of themselves and all others similarly situated, request that judgment be entered in their favor and against Defendant Johnson Controls as follows:

A. An Order certifying this matter as a Class Action pursuant to Fed. R. Civ. P. 23 on behalf of a nationwide class of commissioned salespersons employed by Defendant at the time of the transition from the FY23 to FY24 Commission Sales Incentive Plan, along with sub-classes of Kansas and Missouri employees for Counts IV-V; appointing the Named Plaintiffs as class representatives; and that notice of the pendency of this action be provided to members of the Class;

B. An order awarding the Named Plaintiffs and the Class actual damages in an amount to be proven at trial based on Johnson Controls' breach of contract;

C.     An Order providing relief in favor of the Named Plaintiffs and the Class in the amount of the benefits received by Johnson Controls and by which Johnson Controls was unjustly enriched;

D.     Providing declaratory relief finding that Johnson Controls is required to pay commissions to the Named Plaintiffs and the Class going forward in accordance with the terms of the Parties' agreement and course of dealing, as set forth in the Commission Sales Incentive Plan under which the commissioned salespersons sold Defendant's products and services;

E.     An Order awarded all statutory relief requested on behalf of the sub-classes in Counts IV-V;

F.     For pre- and post-judgment interest; and

G.     For such other and further relief as the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all causes of action and claims with respect to which they have a right to trial by jury.

Dated: January 12, 2024

**HAWKS QUINDEL S.C.**

s/Summer H. Murshid
Summer H. Murshid SBN 1075404
Larry A. Johnson SBN 1056619

5150 North Port Washington Road
Suite 243
Milwaukee, WI 53217
Telephone: (414) 271-8650

25

Fax:      (414) 207-6079
E-mail:        smushid@hq-law.com
               ljohnson@hq-law.com

**HKM EMPLOYMENT ATTORNEYS LLP**

John J. Ziegelmeyer III, MO 59042   (Admission To be Filed)
jziegelmeyer@hkm.com
Brad K. Thoenen, MO 59778        (Admission To be Filed)
bthoenen@hkm.com
Kevin A. Todd, MO 73048          (Admission To be Filed)
ktodd@hkm.com
1501 Westport Road
Kansas City, Missouri 64111
816.875.9339

ATTORNEYS FOR PLAINTIFFS