# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

DANIEL NOVIN, STEWART SWANDER, )
TIMOTHY BUTLER, REID BEGNOCHE, )
DUSTIN BROWN, JEFFREY ERKER, )
SAM KLUMPERS, GARY GRAY, )
CHRISTOPHER JOHNSTON, JOSEPH PEREA, )
BRIAN REIS, MARK ZIP, PATRICK MOONEY, )
DAVID HOWZE, SCOTT McCOLLAM, )
MATT CARVILLE, RICKY SCOTT, )
MICHAEL MIGLIACCIO, KEITH WAHL, )
ANDREW HUNTZINGER, )
WILLIAM ROBERTS, and FROILAN GARMA )
on behalf of themselves individually )
and all other similarly situated employees, )
                              )
      *Plaintiffs*, )
                              )
vs. )      Case No. 24-CV-00046
                              )
JOHNSON CONTROLS, INC. )
                              )
      *Defendant*. )

## AMENDED CLASS ACTION COMPLAINT

For their Amended Class Action Complaint, pursuant to Rule 15(a)(1), Daniel Novin, Stewart Swander, Timothy Butler, Reid Begnoche, Dustin Brown, Jeffrey Erker, Sam Klumpers, Gary Gray, Christopher Johnston, Joseph Perea, Brian Reis, Mark Zip, Patrick Mooney, David Howze, Scott McCollam, Matt Carville, Rick Scott, Michael Migliaccio, Keith Wahl, Andrew Huntzinger, William Roberts, and Froilan Garma (the "Named Plaintiffs"), on behalf of themselves individually and all other similarly situated employees of Defendant Johnson Controls, Inc. ("Johnson Controls"), state as follows:

## INTRODUCTION

1. The Named Plaintiffs bring this action in their individual capacities and on behalf of a nationwide class of similarly situated salespersons employed by Johnson Controls in connection with a new incentive plan that robs the Named Plaintiffs and the class of millions of dollars of incentives and commissions that Johnson Controls had previously agreed to pay them for contracts that the Named Plaintiffs procured and closed.

2. For the last couple of decades at least, Johnson Controls had paid incentives (*i.e.* commissions arising out of contracts that the salespersons closed) to its salespersons (of which the Named Plaintiffs are but a few) at generally regular intervals over the course of the project or contract at issue.

3. Under this system, the Named Plaintiffs would receive an initial commission payment of approximately 20-25% of the overall commission shortly after closing the contract. Over the life of the project, Johnson Controls would then pay the remaining 75-80% of the salespersons' commissions. In salesperson lingo, the portion of their commission remaining to be paid was referred to as a "backlog."

4. Over the years, the Named Plaintiffs accumulated substantial backlogs—ranging from a few thousand dollars to backlogs well into the six figures—of commissions or incentives that Johnson Controls had agreed to pay them over the course of various contracts and projects.

5. Under the payment plans in place prior to October 1, 2023, if a Named Plaintiff procured and closed a contract that called for customer payments to be made over the course of multiple fiscal years, Johnson Controls agreed to pay the Named Plaintiffs commissions or incentives under the payment plan in effect <u>at the time the contract was closed</u>.

6.     This "grandfathering" provision—as Johnson Controls called it—ensured that the Named Plaintiffs earned commissions or incentives on work that they performed commensurate with their expectations at the time the work was performed.

7.     If the Named Plaintiffs closed a contract in 2021 that they expected to net them a total incentive or commission of $10,000 over the course of the company's next two fiscal years, the grandfathering provision made sure that, even if Johnson Controls changed the overall compensation plan for a subsequent fiscal year, it was still agreeing to abide by the terms of the deal it had in place with the salesperson when the sale was closed in 2021. With this grandfathering provision, the Named Plaintiffs had some assurance that Johnson Controls would abide by the terms of its incentive agreement and pay the salesperson the $10,000 commission (subject to adjustments) that the parties had contemplated when the contract had closed.

8.     This grandfathering provision also served to provide the Named Plaintiffs with some assurance as to their future salary. They understood that, while the timeframe within which they would receive their backlog might stretch over the course of several months or even years, they nonetheless could bank on a very high percentage of their accrued backlog being paid to them. Naturally, the Named Plaintiffs took their expected backlogs into their and their families' financial planning and futures.

9.     In November 2023, Johnson Controls announced that, though it was going to continue servicing the contracts and working on the projects under which an apparent record $12.1 billion dollars in backlog were due to be paid to the company, and though it was planning on accepting payment from its customers for the billions of dollars in backlog that are owed, Johnson Controls was reneging on its promise to pay the Named Plaintiffs and their similarly situated

3

colleagues across the country the incentives and commissions that made up the Named Plaintiffs' backlogs.

10. Inexplicably, Johnson Controls removed the grandfathering provision that ensured a basic fairness in the commission structure under which the Named Plaintiffs and Johnson Controls operated. Johnson Controls will assuredly attempt to hold its customers to the project and service agreements that they signed, and the customers will continue to pay Johnson Controls billions of dollars in backlog that Johnson Controls and its shareholders will benefit from.

11. However, because of the new FY24 incentive plan, the Named Plaintiffs—the salespersons who procured and closed the contracts at issue, and who earned the incentive or commission attached to those contracts—will see none of their accrued backlog. Their financial futures are now in jeopardy.

12. Accordingly, the Named Plaintiffs bring the various claims below—as individuals and on behalf of their colleagues across the country—to recover the millions of dollars of damage that Johnson Controls has caused.

## **PARTIES**

13. Plaintiff Daniel Novin is employed as an Account Executive by Johnson Controls, a position he has held since 2011. Novin resides in Overland Park, Kansas, and works out of Johnson Controls' office in Lenexa, Kansas.

14. Plaintiff Stewart Swander has been employed by Johnson Controls since March 2019 as a Field Sales Executive I. Swander resides in Olathe, Kansas, and works out of Johnson Controls' office in Lenexa, Kansas.

15.     Plaintiff Timothy Butler is employed as an Account Executive by Johnson Controls, a position he has held since approximately 2004. Butler resides in Overland Park, Kansas, and works out of Johnson Controls' office in Lenexa, Kansas.

16.     Plaintiff Reid Begnoche is employed as an Account Executive by Johnson Controls, a position he has held since 2013. Begnoche resides in Olathe, Kansas, and works out of Johnson Controls' office in Lenexa, Kansas.

17.     Plaintiff Dustin Brown is employed as an Account Executive by Johnson Controls, a position he has held since 2003. Brown resides in Nixa, Missouri, and works out of Johnson Controls' office in Springfield, Missouri.

18.     Plaintiff Jeffrey Erker is employed as an Account Executive by Johnson Controls, a position he has held since 1998. Erker resides in Chesterfield, Missouri, and works out of Johnson Controls' office in St. Louis, Missouri.

19.     Plaintiff Sam Klumpers is employed as an Account Executive by Johnson Controls. Klumpers resides in Cottage Grove, Wisconsin, and works out of Johnson Controls' office in Madison, Wisconsin.

20.     Plaintiff Gary Gray is employed as an Account Executive by Johnson Controls. Gray resides in Kingsport, Tennessee, and works out of Johnson Controls' office in Johnson City, Tennessee.

21.     Christopher Johnston is employed as an Account Executive by Johnson Controls. Johnston resides in Johnson City, Tennessee and works out of Johnson Controls' office in Johnson City, Tennessee.

22.     Joseph Perea is employed as an Account Executive by Johnson Controls. Perea resides in Albuquerque, New Mexico and works out of Johnson Controls' office in Albuquerque, New Mexico.

23.     Brian Reis is employed as an Account Executive by Johnson Controls. Reis resides in Mt. Pleasant, South Carolina and works out of Johnson Controls' office in Charleston, South Carolina.

24.     Mark Zip is employed as an Account Executive by Johnson Controls. Zip resides in Beaufort, South Carolina and works out of Johnson Controls' office in Charleston, South Carolina.

25.     Patrick Mooney is employed as an Account Executive by Johnson Controls. Mooney resides in Justin, Texas and works in the Dallas/Fort Worth, Texas region.

26.     David Howze is employed as an Account Executive by Johnson Controls. Howze resides in Lewisville, Texas and works in the Dallas/Fort Worth, Texas region.

27.     Scott, McCollam is employed as an Account Executive by Johnson Controls. McCollam resides in Southlake, Texas and works in the Dallas/Fort Worth, Texas region.

28.     Matt Carville is employed as an Account Executive by Johnson Controls. Carville lives in Houston, Texas and works in the Houston, Texas region.

29.     Ricky Scott is employed as an Account Executive by Johnson Controls. Scott lives in Prattville, Alabama and works out of Johnson Controls' office in Montgomery, Alabama.

30.     Michael Migliaccio is employed as an Account Executive by Johnson Controls. Migliaccio lives in Gainesville, Georgia and works out of Johnson Controls' office in Atlanta, Georgia.

31.     Keith Wahl is employed as an Account Executive by Johnson Controls. Wahl lives in Varysburg, New York and works for Johnson Controls in western New York.

32.     Andrew Huntzinger is employed as an Account Executive by Johnson Controls. Huntzinger lives in Indianapolis, Indiana and works out of Johnson Controls' office in Indianapolis, Indiana.

33.     William Roberts is employed as an Account Executive by Johnson Controls. Roberts lives in Parker, Colorado and works out of Johnson Controls' office in Aurora, Colorado.

34.     Froilan Garma is employed as an Account Executive by Johnson Controls. Garma lives in Ewa Beach, Hawaii and works out of Johnson Controls' office in Honolulu, Hawaii.

35.     While the Named Plaintiffs have and have had a range of job titles during their employment with Johnson Controls, they all perform similar jobs—selling equipment and projects to Johnson Controls' clients within their region.

36.     Defendant Johnson Controls, Inc. ("Johnson Controls," or "Defendant") is the United States-based subsidiary of Johnson Controls International, Inc. Johnson Controls maintains its principal place of business at 5757 N. Green Bay Avenue, Milwaukee, Wisconsin 53209. Johnson Controls can be served through its Registered Agent, C T Corporation System, at 301 S. Bedford Street, Suite 1, Madison, Wisconsin 53703.

## JURISDICTION AND VENUE

37.     The Named Plaintiffs bring class action claims for breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment, as well as claims for violations of various state wage payment statutes.

38.     This Court has original federal question jurisdiction over this prospective class action under 28 U.S.C. § 1332(d) because the sum in controversy exceeds $5,000,000 exclusive

7

of interests and costs, and all but one of the Named Plaintiffs and most of the prospective Class Members are citizens of a state different than Defendant Johnson Controls.

39.     The venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant is a resident of this judicial district, and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS

40.     Defendant Johnson Controls is a Wisconsin for-profit corporation. It is a subsidiary of Johnson Controls International, a multinational conglomerate based in Cork, Ireland with its North American headquarters in Wisconsin.

41.     Johnson Controls operates over 200 locations across the United States. It employs several hundred commissioned salespersons across the United States in commissioned sales positions substantially similar to the positions held by the Named Plaintiffs.

42.     At all relevant times, the Named Plaintiffs and all others similarly situated were commissioned salespersons employed by Defendant.

43.     Plaintiffs Novin, Swander, Butler, and Begnoche sell equipment and projects to Johnson Controls clients in the Kansas City district, which includes clients in both Kansas and Missouri.

44.     Plaintiff Brown sells equipment and projects to Johnson Controls clients in the Springfield, Missouri district.

45.     Plaintiff Erker sells equipment and projects to Johnson Controls clients in the St. Louis, Missouri district.

46.     Plaintiffs Klumpers, Gray, Johnston, Perea, Reis, Zip, Mooney, Howze, McCollam, Carville, Scott, Migliaccio, Wahl, Huntzinger, Roberts, and Garma sell equipment and projects to

8

Johnson Controls clients in Wisconsin, Tennessee, New Mexico, South Carolina, Texas, Alabama, Georgia, New York, Indiana, Colorado, and/or Hawaii.

*Sales Process*

47.     From the time a prospective client is identified, the process for the Named Plaintiffs of engaging a client, developing a proposal, and pitching and selling it to the client generally takes several months.

48.     Once a project is sold, the Named Plaintiffs hand the project off to Defendant's operations team to execute the project. At that point, the Named Plaintiffs' work on the project is largely complete, outside of answering the occasional client question.

49.     The process laid out above—from prospective client identification through sale and handing off of the project to the operations team—was and is the same for all of Defendant's commissioned salespersons, regardless of their specific job title, within its Fire, Security, and HVAC divisions.

*Historic Commission Structure and the "Backlog"*

50.      The Named Plaintiffs and all other similarly situated employees of Defendant operate under a commission sales incentive plan (the "Plan").

51.     From the time each of the Named Plaintiffs' respective employment periods began with Johnson Controls through the end of Defendant's fiscal year ending on September 30, 2023 ("FY23"), the Plan was slightly modified each year, but its general structure remained largely the same.

52.     Whenever one of the Named Plaintiffs completed a sale, he could expect to receive between 6.5% and 7.0% of the profit margin on that sale as commission, which Johnson Controls refers to as an "incentive."

53. For example, if one of the Named Plaintiffs sold a $1 million project on which Johnson Controls made a $300,000 profit, the Named Plaintiff could expect to receive incentives (*i.e.*, commissions) between roughly $19,500 and $21,000 for that project.

54. The Named Plaintiff would typically receive around 25% of the expected incentive on a project upon completion of the sale. In the above example, that initial payment would be between roughly $4,875 and $5,250.

55. The remaining incentive—in the above example, between $14,625 and $15,750—was referred to as the salesperson's "backlog."

56. The backlog for the Named Plaintiff was paid out over time as the operations team completed the project and the client paid for services rendered. Johnson Controls referred to these periodic payments as "Monthly Incentives."

57. Payment to the salesperson of the final portion of the backlog—called the "Closeout Incentive"—on a given project was made at or shortly after the time the client made their final payment.

58. At the time of this final payment, the backlog would be "trued up," such that the salesperson's total incentive on the project equaled the percentage of the profit margin set forth in the Plan. If a project went over or under on projected costs at the time of the sale, the final backlog payment could be smaller or larger than initially anticipated, respectively.

59. Averaged out across projects, salespersons could and did expect to receive total incentive payments in an amount very close to their initially estimated backlog.

60. The exact numbers and percentages above are only one example and may vary slightly across the company or year to year. However, the core facts of the above-described process of incentive calculation, accrual of the backlog, and payout over time applied equally to Plaintiff

Novin, the other Named Plaintiffs, and to all other similarly situated employees of the Defendant within Defendant's Fire, Security, and HVAC divisions.

61.     The Named Plaintiffs understood that their sales incentive plan may vary somewhat—or possibly even significantly—prospectively from one year to the next. However, they also had an understanding that Defendant would not, and so far as they knew could not, retroactively eliminate their expected commissions on deals they had closed under prior versions of the incentive plan.

***Transition to the FY24 Commission Sales Plan***

62.     Prior to the rollover from FY23 to the Fiscal Year 2024 (October 1, 2023 – September 30, 2024, "FY24"), Johnson Controls had a practice of paying out its salespersons' backlog under the incentive plan that was effective in the year a sale was made.

63.     Johnson Controls referred to this practice as "Grandfathered' Contracts" and agreed, for example, in FY23, that "All open contracts secured prior to the effective date of this plan [October 1, 2022] will not earn sales incentive under this Plan and will be paid in accordance with the plan in effect at time of booking." The same or similar language appears in prior versions of the Plan, dating back at least to FY16.

64.     For example, if a commissioned salesperson made a sale in FY21 and a portion of their incentive on that sale was backlogged (as was the case with the majority of contracts) and paid out over the course of the next two years (FY22 and FY23), that backlogged incentive was paid out under the terms of the FY21 Plan.

65.     Commissioned salespersons, including the Named Plaintiffs, could and did understand that part of their agreement with Johnson Controls was that they would be paid commissions under the Plan in effect the year a sale was made.

66.     Commissioned salespersons, including the Named Plaintiffs, could and did make significant financial and life decisions based on the expected payout of their backlogged commission over time in accordance with that agreement.

*Fiscal Year 2024 Plan*

67.     In November 2023, Johnson Controls announced the sales incentive compensation plan for FY24. The FY24 Plan purported to be retroactive to October 1, 2023.

68.     The FY24 Plan completely overhauled the general commission system outlined above that had been in place, with only minimal tweaks, for several years. Defendant characterized the change as a "full sales incentive plan redesign."

69.     In particular, the FY24 Plan eliminates use of the backlog, shifting to a plan where commission is earned and paid out at the time a project is booked, rather than over time as the project is paid.

70.     Unlike with Plan changes in previous years, Defendant unilaterally determined that commission for any sales made during previous years under prior versions of the Plan would *not* continue to be governed by the plans in effect at the time of the sale.

71.     Instead, all sales, including those made prior to adoption of the FY24 Plan, would be governed by the FY24 Plan.

72.     This new policy meant that salespersons' accrued backlog—which the salespeople had done the work to earn, and which Johnson Controls had previously agreed to pay its salespeople over the time that the project took to complete—would no longer be paid out.

73.     The accrued backlogs benefit Defendant, adding to Defendant's balance sheet and profit margin, unless and until they are paid out to the Named Plaintiff's and similarly situated commissioned salespersons.

12

74.     The accrued backlogs were built through the hard work of the named Plaintiffs and others similarly situated.

75.     Defendant previously recognized the commissioned salespersons' hard work by paying them their accrued backlogs as envisioned by the incentive compensation plans.

76.     With the transition to the FY24 Plan and the accompanying decision to treat the backlogs as unearned and eliminate them, Defendant determined that it would retain the backlogs and keep and use that benefit for itself.

77.     In its most recent Form 10-K, Johnson Controls represented that its backlog was $13.6 billion, and that "backlog is a useful measure of evaluating the Company's operational performance and relationship to total orders."

78.     In announcing the new plan, Johnson Controls represented that, "Sales booked prior to October 1, 2023, which have not reached the required milestones for commission eligibility are not earned or due for payment."

79.     As part of the FY24 Plan, and to apparently "assist" the Named Plaintiffs and those similarly situated with what Johnson Controls termed a "transition" to the new Plan, Johnson Controls made a "one time bridge payment" to its commissioned salespersons that was "not meant to substitute for unearned commissions" (*i.e.*, backlogs).

80.     When bridge payments were made in November 2023, the payments constituted 22% of their backlog for each of the Named Plaintiffs.

On information and belief, all employees similarly situated to the Named Plaintiffs also received bridge payments equal to 22% of their accrued backlog.

***Backlog Information is Wiped from Employee Portals***

81. Shortly after the transition to the FY24 Plan was announced, several of the Named Plaintiffs began attempting to preserve information about their then-existing backlogs.

82. Within a day or two of the announced change, however, they discovered that all information about their backlogs that had previously been in their employee portals had been wiped out and was no longer available.

83. In addition, Defendant has not provided copies of the full FY23 Plan or FY24 Plan to its commissioned salespersons, even upon request by the employees. Instead, employees only have a slideshow presentation that claims to be a summary of the Plans.

84. Since the transition to the FY24 Plan purported to take effect on October 1, 2023, prior to the Plan's mid-November rollout, portions of the backlog for each Named Plaintiff would have been due to be paid out under the previously operative Plans the backlogged incentives were accrued under. Those portions of the backlog have been retained by Defendant and not paid to the Plaintiffs.

***Johnson Controls Requires New Restrictive Covenant for Salespersons to Obtain Additional "Bridge" Payments in 2025 and 2026***

85. Following its announcement that it was eliminating the backlogs that it had previously agreed to pay its salespersons—including the Named Plaintiffs and all that are similarly-situated to them—Johnson Controls received significant opposition to the new plan from its salespersons.

86. In response to the backlash, in early December 2023, Johnson Controls offered two additional "bridge" payments to the Named Plaintiffs and all others similarly situated.

87. The "Sales Bridge Retention Payment" program, as Johnson Controls called it, provided the Named Plaintiffs (and all others similarly situated) with "up to two additional bridge retention payments," one in June 2025 and another in June 2026.

88. Each of the two payments offered under the Sales Bridge Retention Payment totaled 14% of the Named Plaintiffs' backlog.

89. Receipt of these payments—in June 2025 and June 2026—was conditioned, in part, on the Named Plaintiffs remaining an "Active Employee" of Johnson Controls during the interim.

90. Additionally, Johnson Controls conditioned receipt of this portion of the backlog on the Named Plaintiffs agreeing to "work[] diligently to perform his or her duties" through the retention period, to receive at least a "Meets Expectations" performance review, and to acknowledge being bound by a set of Terms and Conditions that contained, among other provisions: (a) a Non-Competition provision that sought to restrict the Named Plaintiffs for one year from leaving Johnson Controls and joining a competitive business; and (b) a Non-Solicitation provision that sought to preclude the Named Plaintiffs from recruiting any other Johnson Controls employees from leaving the company, and more importantly, from soliciting the business of Johnson Controls' customers.

91. Put differently, Johnson Controls conditioned receipt of the backlogs accrued in past fiscal years on the Named Plaintiffs and those similarly situated agreeing to continuing to work at Johnson Controls with additional restrictive covenants that would limit the Named Plaintiffs' ability to find work after they left Johnson Controls.

### Backlogs as of September 30, 2023

92. *Novin.* As of the end of FY23, Novin's backlog totaled $40,570.15. **Exhibit A**, which has been redacted, reflects the various contracts that Novin closed during prior fiscal years,

the status of those contracts, the incentives that Johnson Controls had originally agreed to pay Novin for the project, and how much of those incentives had been paid to Novin as of September 30, 2023.

93.    As evidenced by Exhibit A, Novin's backlog encompasses contracts that Novin closed during the last few fiscal years, with many of the incentives remaining for prior fiscal years 2021 and 2022.

94.    As an example, on one contract (Contract No. 1N420172) that Novin closed in the Spring of 2021, his estimated total incentive earned under the Plan in place during that fiscal year was $4,786.49.

95.    As of September 30, 2023, Johnson Controls had only paid Novin a total of $3,424.82, leaving a "remaining incentive" of $1,360.67—over 28% of the promised commission for the project—for that project that Johnson Controls had agreed to pay Novin as the project made its way to completion.

96.    On information and belief, Johnson Controls will continue to receive payments from its customers on the contracts after October 1, 2023 reflected on Exhibit A that, in prior fiscal years, would have then been paid to Novin as an incentive.

97.    ***Swander.*** As of the end of FY23, Swander's backlog totaled $66,608.88. **Exhibit B**, which has been redacted, reflects the various contracts that Swander closed during prior fiscal years, the status of those contracts, the incentives that Johnson Controls had originally agreed to pay Swander for the project, and how much of those incentives had been paid to Swander as of September 30, 2023.

16

98.     As evidenced by Exhibit B, Swander's backlog encompasses contracts that Swander closed during the last few fiscal years, with many of the incentives remaining for prior fiscal years 2021 and 2022.

99.     As an example, on one contract (Contract No. 1N420365) that Swander closed in the Fall of 2021, his estimated total incentive earned under the Plan in place during that fiscal year was $5,279.20.

100.     As of September 30, 2023, Johnson Controls had only paid Novin a total of $3,825.98, leaving a "remaining incentive" of $1,453.22—over 27.5% of the promised commission for the project—for that project that Johnson Controls had agreed to pay Swander as the project made its way to completion.

101.     On information and belief, Johnson Controls will continue to receive payments from its customers on the contracts after October 1, 2023 reflected on Exhibit B that, in prior fiscal years, would have then been paid to Swander as an incentive.

102.     ***Butler.*** As of the end of FY23, Butler's backlog totaled $65,814.69. **Exhibit C**, which has been redacted, reflects the various contracts that Butler closed during prior fiscal years, the status of those contracts, the incentives that Johnson Controls had originally agreed to pay Butler for the project, and how much of those incentives had been paid to Butler as of September 30, 2023.

103.     As evidenced by Exhibit C, Butler's backlog encompasses contracts that Butler closed during the last few fiscal years, with many of the incentives remaining for prior fiscal years 2021 and 2022.

104.    As an example, on one contract (Contract No. 1N420145) that Butler closed in the Fall of 2021, his estimated total incentive earned under the Plan in place during that fiscal year was $11,070.53.

105.    As of September 30, 2023, Johnson Controls had only paid Butler a total of $8,079.95, leaving a "remaining incentive" of $2,990.58—over 37% of the promised commission for the project—for that project that Johnson Controls had agreed to pay Butler as the project made its way to completion.

106.    On information and belief, Johnson Controls will continue to receive payments from its customers on the contracts after October 1, 2023 reflected on Exhibit C that, in prior fiscal years, would have then been paid to Butler as an incentive.

107.    ***Begnoche.*** As of the end of FY23, Begnoche's backlog totaled $63,688.32. **Exhibit D**, which has been redacted, reflects the various contracts that Begnoche closed during prior fiscal years, the status of those contracts, the incentives that Johnson Controls had originally agreed to pay Begnoche for the project, and how much of those incentives had been paid to Begnoche as of September 30, 2023.

108.    As evidenced by Exhibit D, Begnoche's backlog encompasses contracts that Begnoche closed during the last few fiscal years, with many of the incentives remaining for prior fiscal years 2021 and 2022.

109.    As an example, on one contract (Contract No. 2N420383) that Begnoche closed in the Summer of 2022, his estimated total incentive earned under the Plan in place during that fiscal year was $14,518.50.

110.    As of September 30, 2023, Johnson Controls had only paid Begnoche a total of $12.793.68, leaving a "remaining incentive" of $1.724.82—almost 12% of the promised

18

commission for the project—for that project that Johnson Controls had agreed to pay Begnoche as the project made its way to completion.

111.     On information and belief, Johnson Controls will continue to receive payments from its customers on the contracts after October 1, 2023 reflected on Exhibit D that, in prior fiscal years, would have then been paid to Begnoche as an incentive.

112.     **Brown.** As of the end of FY23, Brown's backlog totaled $71,119.74. **Exhibit E**, which has been redacted, reflects the various contracts that Brown closed during prior fiscal years, the status of those contracts, the incentives that Johnson Controls had originally agreed to pay Brown for the project, and how much of those incentives had been paid to Brown as of September 30, 2023.

113.     As evidenced by Exhibit E, Brown's backlog encompasses contracts that Brown closed dating back to fiscal year 2020.

114.     As an example, on one contract (Contract No. 0N570057) that Brown closed in 2020, his estimated total incentive earned under the Plan in place during that fiscal year was $10,227.47.

115.     As of September 30, 2023, Johnson Controls had only paid Brown a total of $7,552.26, leaving a "remaining incentive" of $2,675.21—over 26% of the promised commission for the project—for that project that Johnson Controls had agreed to pay Brown as the project made its way to completion.

116.     On information and belief, Johnson Controls will continue to receive payments from its customers on the contracts after October 1, 2023 reflected on Exhibit E that, in prior fiscal years, would have then been paid to Brown as an incentive.

117. ***Erker.*** As of the end of FY23, Erker's backlog totaled $176,626.38. **Exhibit F**, which has been redacted, reflects the various contracts that Erker closed during prior fiscal years, the status of those contracts, the incentives that Johnson Controls had originally agreed to pay Erker for the project, and how much of those incentives had been paid to Erker as of September 30, 2023.

118. As evidenced by Exhibit F, Erker's backlog encompasses contracts that Erker closed during the last few fiscal years, with many of the incentives remaining for prior fiscal years 2021 and 2022.

119. As an example, on one contract (Contract No. 2N100139) that Erker closed in early 2022, his estimated total incentive earned under the Plan in place during that fiscal year was $30,082.02.

120. As of September 30, 2023, Johnson Controls had only paid Novin a total of $10,520.01, leaving a "remaining incentive" of $19,562.01—over 65% of the promised commission for the project—for that project that Johnson Controls had agreed to pay Erker as the project made its way to completion.

121. On information and belief, Johnson Controls will continue to receive payments from its customers on the contracts after October 1, 2023 reflected on Exhibit F that, in prior fiscal years, would have then been paid to Erker as an incentive.

122. Johnson Controls maintained contract incentive logs for the other Named Plaintiffs, including Plaintiffs Klumpers, Gray, Johnston, Perea, Reis, Zip, Mooney, Howze, McCollam, Carville, Scott, Migliaccio, Wahl, Huntzinger, Roberts, Garma, and all other similarly situated employees, similar to the logs attached as Exhibits A-F.

123.    As with Exhibits A-F, the contract incentive logs for each other Named Plaintiff and those similarly situated reflect contracts that those Plaintiffs were credited with closing, the amount of commission received on the project to date, and the backlogged commission still owed to the Plaintiff by Johnson Controls.

124.    In each case, on information and belief, Johnson Controls will continue to receive payments from its customers on the contracts reflected in the logs that, in prior fiscal years—and absent a bad faith elimination of the "grandfathering provision"—would have been paid, at least in part, to the Named Plaintiffs and those similarly situated as incentive compensation.

*Class Allegations*

125.    Plaintiffs bring all counts as a class action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23. The Nationwide Class that the Named Plaintiffs seek to represent is composed of and defined as follows:

> "All individuals currently or formerly employed by Defendant Johnson Controls as commissioned salespersons with accrued backlogs who were employed on October 1, 2023."

126.    Plaintiffs also bring state statutory claims under Kansas, Missouri, Wisconsin, South Carolina, Alabama, New York, Indiana, Colorado, and Hawaii law, on behalf of themselves individually and others similarly situated. Some of the Plaintiffs from particular states seek to represent sub-classes of the above-defined Nationwide Class, consisting of members of the Nationwide Class who are employed in each listed state, respectively.

127.    **Numerosity.** Johnson Controls employs at least several hundred commissioned salespersons across the United States at any given time, including at the time of the transition between the FY23 and FY24 Plans (October 1, 2023). Class members are therefore far too numerous to be individually joined in this lawsuit.

128.    **Existence and Predominance of Common Questions.** Common questions of law and/or fact exist as to the members of the Class, and common questions of law and/or fact predominate over any questions affecting only individual members of the Class. The common questions include the following:

a.    Whether members of the Nationwide Class had contractual relationships with the Defendant, whereby the Class Members were obligated to perform their duties and responsibilities as salespersons for Defendant in exchange for, among other things, a compensation plan that provided for commissions or incentives to be paid to the salespersons for sales that Defendant credited them with closing, and to be paid over the course of the projects or deals closed;

b.    Whether Defendant agreed to pay the Class Members for services performed in accordance with the terms of compensation plans that were in effect during the fiscal years at issue;

c.    Whether Defendant breached its agreements with the Class Members by eliminating the backlog of commissions that the Class Members had established under prior years' fiscal year's compensation plans;

d.    Whether Defendant breached its agreements with the Class Members when it refused to pay commissions according to the compensation plans that were in existence when the Class Members sold Defendant's products and services (*i.e.*, when the contracts were closed);

e.    Whether Defendant breached its contract with the Class Members by retroactively changing the contract in mid-November 2023 with changes that purported to take effect on October 1, 2023;

f.    Whether Defendant breached its contract with the Class Members by retroactively eliminating backlogged commissions that the Class Members had done all the work within their control to earn under prior fiscal year compensation plans;.

g.    Whether Defendant breached the covenant of good faith and fair dealing by unilaterally interpreting its reserved right to "modify" the compensation plan to allow for elimination of commission payments that the Defendant had previously agreed to pay the Class Members for closed contracts and that the Class Members had done everything in their control to earn;

h.    Whether Defendant breached the covenant of good faith and fair dealing by eliminating the "Grandfathering Provision" that had been within every other compensation

22

plan for decades and that ensured that the Named Plaintiffs' incentives accrued under prior years' payment plans would, in fact, be paid out to them even as the payment plans could change prospectively;

i.      Whether Defendant breached the covenant of good faith and fair dealing by exercising its discretion under the Plans in a manner that robbed Plaintiffs of the benefit of their bargain by modifying conditions—the backlog, the time over which incentives would be paid out, and the Grandfathered Contracts provision—that were uniquely within the control of Defendant;

j.      Whether Defendant's decision to retain the backlogs of its commissioned salespersons for itself has caused Defendant to be unjustly enriched by enjoying the benefit of labor for which it did not pay; and

k.      Whether the Named Plaintiffs and the Class Members are entitled to damages and/or equitable relief, including but not limited to restitution, disgorgement, and a preliminary and/or permanent injunction, and if so, the proper measure and formulation of such relief.

129.    **Typicality.** The Named Plaintiffs' claims are typical of the claims of the Class. Defendant's common course of conduct and violations of law alleged herein has been taken as to each Class Member and has caused the Class to sustain the same or similar injuries and damages. Plaintiffs' claims are thereby representative of and coextensive with the claims of the proposed class.

130.    **Adequacy.** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this class action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of members of the Class.

131.    **Superiority.** The class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each member of the Class, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of

individual claims against Defendant economically feasible. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues in this case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

132.     In the alternative, the Class may be certified because: (a) the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class, which would establish incompatible standards of conduct for Johnson Controls; and (b) Johnson Controls has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

<u>**COUNT I – BREACH OF CONTRACT**</u>

133.     The Named Plaintiffs repeat the allegations above as if fully set forth herein.

134.     Defendant established a valid, enforceable contact with the Named Plaintiffs and all those similarly situated such that in exchange for the salespersons selling Defendant's goods and services to its clients, Defendant would pay the commissioned salespersons a commission or incentive according to the Commission Sales Incentive Plan effective at the time the sale was booked.

135.     In November 2023, Defendant modified the Commission Sales Incentive Plan, for FY24, a change that purported to be retroactive to October 1, 2023.

136.     In effect, the FY24 plan retroactively changed the plans that had been in effect for prior years, by eliminating the backlogged commissions that the Plaintiffs and others similarly situated had done the work necessary to earn under prior iterations of the Plan.

137.    Since October 1, 2023, commissions have come due on sales made under older versions of the Commission Sales Plan. Commissions will continue to come due under older versions of the Plan going forward as well.

138.    Defendant has breached its employment contracts with its salespersons, including the Named Plaintiffs and all of their colleagues, by failing to pay commissions according to the Plan under which those sales were made.

139.    As a direct and proximate result of Defendant's breach, the Named Plaintiffs and all those similarly situated have suffered and will continue to suffer significant economic loss.

140.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

<u>**COUNT II – BREACH OF THE IMPLIED DUTY OF
GOOD FAITH AND FAIR DEALING**</u>

141.    The Named Plaintiffs repeat the allegations above as if fully set forth herein.

142.    Defendant established a valid, enforceable contact with the Named Plaintiffs and all those similarly situated such that in exchange for the salespersons selling Defendant's goods and services to its clients, Defendant would pay the commissioned salespersons a commission or incentive according to the Commission Sales Incentive Plan effective at the time the sale was booked.

143.    This employment contract between the Named Plaintiffs (and each of their sales colleagues) and Johnson Controls implies good faith and fair dealing between the parties, as well as a duty of cooperation on the part of both parties to the contract.

144.    By eliminating the backlog and wiping out the incentives that the Named Plaintiffs had accrued under past incentive and commission plans, Johnson Controls has acted in bad faith and in violation of the implied covenant of good faith and fair dealing that is binding on both parties to the employment contract.

145.	The Named Plaintiffs have, in good faith, performed their obligations under the employment contracts that they have with Johnson Controls.

146.	Johnson Controls' bad faith action to retroactively change the Plan and the requirements for the Named Plaintiffs to obtain commission payments that were particularly and uniquely within Defendant's control unjustifiably prevents the Named Plaintiffs and others similarly situated from being able to obtain the benefit of their bargain with Defendant.

147.	As a result of Johnson Controls' breach of this implied covenant of good faith and fair dealing, the Named Plaintiffs and all others similarly situated have suffered damages in an amount to be determined at trial.

## COUNT III – UNJUST ENRICHMENT

148.	The Named Plaintiffs repeat the allegations above as if fully set forth herein.

149.	The Count is pled in the alternative to Counts I and II, in the event the Court determines a contract between the Parties does not exist or cover all of the Named Plaintiffs' claims.

150.	The Named Plaintiffs and all others similarly situated provided good and valuable services to Johnson Controls, engaging customers on their need for Defendant's products and selling Defendant's goods and services, all of which contributed to the financial success of Johnson Controls.

151.	The Named Plaintiffs and all others similarly situated provided these services based on the reasonable expectation that they would be compensated fairly and in accordance with the Plan in effect when they performed the work necessary to make the sale.

152.	Johnson Controls knowingly accepted and appreciated the benefits of the services performed by the Named Plaintiffs and all others similarly situated.

153.    Johnson Controls is now attempting to retain for itself millions of dollars in backlogged commissions that were secured by the hard work of the Named Plaintiffs and those similarly situated, who at the time of the work, had been told by Johnson Controls that they would receive backlogged commission payments for their work on the projects in the normal course of those projects.

154.    Under the circumstances, it would be inequitable for Johnson Controls to retain those backlogged commissions without providing compensation to the Named Plaintiffs and all others similarly situated.

## COUNT IV – KANSAS WAGE PAYMENT ACT (Brought by Plaintiffs Novin, Swander, Butler, and Begnoche on behalf of a Sub-Class of Kansas Employees)

155.    Plaintiff Novin, Swander, Butler, and Begnoche repeat the allegations above as if fully set forth herein.

156.    Defendant Johnson Controls is the employer of Plaintiffs Novin, Swander, Butler, Begnoche and those similarly situated under Kansas law.

157.    K.S.A. § 44-314(a) requires employers such as Defendant to pay their employees, including Novin, Swander, Butler, and Begnoche "all wages due to the employees of the employer at least once during each calendar month."

158.    The Plaintiffs' backlogged commissions constitute wages due to the employees under Kansas law that Johnson Controls has agreed to pay.

159.    Defendant has willfully failed to pay the backlogged commissions as wages as they agreed.

160.    Under K.S.A. § 44-315(b), Defendant is liable to Plaintiffs for the unpaid wages and a penalty of 1% per day up to an amount equal to 100% of the unpaid wages.

**COUNT V – MISSOURI WAGE PAYMENT LAW (Brought by Plaintiffs Brown and Erker on behalf of a Sub-Class of Missouri Employees)**

161.    Plaintiffs Brown and Erker repeat the allegations above as if fully set forth herein.

162.    Plaintiffs Brown, Erker, and those similarly situated are sales representatives of Defendant under Missouri law.

163.    The written terms of a contract govern when commission payments come due in Missouri. Mo. Rev. Stat. § 407.912.1.

164.    Under the terms of the Missouri Plaintiffs' contracts with Johnson Controls, commission payments from the sales representatives' backlogs have come due since October 1, 2023, and continue to come due every month going forward.

165.    Defendant has failed and continues to fail to pay the Missouri Plaintiffs' commissions under the terms of their contracts.

166.    Under Mo. Rev. Stat. § 407.913, Defendant is liable to the Missouri Plaintiffs and the Sub-Class of Missouri employees for actual damages sustained, an additional amount as if the sales representative were still earning commission on an annualized pro rata basis, and attorneys' fees and costs incurred in bringing this action.

**COUNT VI – WISCONSIN WAGE CLAIM (Brought by Plaintiff Klumpers on behalf of a Sub-Class of Wisconsin Employees)**

167.    Plaintiff Klumpers repeats the allegations above as if fully set forth herein.

168.    Under Wisconsin law, Plaintiff Klumpers and others similarly situated are employees of Defendant Johnson Controls.

169.    Wisconsin employees are entitled to receive as wages "remuneration . . . for personal services, including salaries, commissions . . . and any other similar advantages agreed

upon between the employer and the employee or provided by the employer as an established policy." Wis. Stat. § 109.01(3).

170.    As evidenced by the terms of the incentive compensation plans and Defendant's decades-long agreement with its employees, Defendant both agreed to and had an established policy of paying its salespersons' commission under the terms of the incentive compensation plan in place at the time a sale was made.

171.    Defendant violated that agreement and policy when it wiped out its Wisconsin employees' backlogs at the beginning of FY24.

172.    Under Wis. Stat. 109.03, as a result of Defendant's violation, Johnson Controls is liable to Plaintiff Klumpers and the Wisconsin Sub-Class for the full amount of wages due and owing, a penalty of up to 50% of the wages due and unpaid, and reasonable costs and expenses incurred in bringing this action.

## COUNT VII – SOUTH CAROLINA WAGE CLAIM (Brought by Plaintiffs Reis and Zip on behalf of a Sub-Class of South Carolina Employees)

173.    Plaintiffs Reis and Zip repeats the allegations above as if fully set forth herein.

174.    Under South Carolina law, Reis, Zip, and others similarly situated are employees of Defendant Johnson Controls.

175.    South Carolina employees are entitled to receive as wages "all amounts at which labor rendered is recompensed, whether the amount is fixed or . . . commission basis . . ." S.C. Code § 41-10-10(2).

176.    Employers in South Carolina, including Defendant, "shall notify each employee in writing" of the agreed-upon wages and the time and place of payment, and must "pay all wages due at the time and place designated." S.C. Code §§ 41-10-30, 41-10-40.

29

177. As evidenced by the terms of the incentive compensation plans and Defendant's decades-long agreement with its employees, Defendant both agreed to and had an established policy of paying its salespersons' commission under the terms of the incentive compensation plan in place at the time a sale was made.

178. Defendant violated that agreement and policy when it wiped out its South Carolina employees' backlogs at the beginning of FY24. Defendant has continuously failed to pay backlogged commissions due as wages under those plans since October 1, 2023.

179. Under S.C. Code § 41-10-80(C), as a result of Defendant's violation, Johnson Controls is liable to Plaintiffs Reis, Zip, and the South Carolina Sub-Class for three times the amount of wages due and owing, plus costs and reasonable attorneys' fees incurred in bringing this action.

## COUNT VIII – ALABAMA WAGE CLAIM (Brought by Plaintiff Scott on behalf of a Sub-Class of Alabama Employees)

180. Plaintiff Scott repeats the allegations above as if fully set forth herein.

181. Under Alabama law, Scott and others similarly situated are employees of Defendant Johnson Controls.

182. Alabama sales employees such as Scott are entitled to receive commission payments per the terms of their incentive contract. Al. Code § 8-24-2(a).

183. As evidenced by the terms of the incentive compensation plans and Defendant's decades-long agreement with its employees, Defendant both agreed to and had an established policy of paying its salespersons' commission under the terms of the incentive compensation plan in place at the time a sale was made.

184.    Defendant violated that agreement and policy when it wiped out its Alabama employees' backlogs at the beginning of FY24. Defendant has continuously failed to pay backlogged commissions due under those plans since October 1, 2023.

185.    Under Al. Code § 8-24-3, as a result of Defendant's violation, Johnson Controls is liable to Plaintiff Scott and the Alabama Sub-Class for three times the amount of wages due and owing, plus costs and reasonable attorneys' fees incurred in bringing this action.

### COUNT IX – NEW YORK WAGE CLAIM (Brought by Plaintiff Wahl on behalf of a Sub-Class of New York Employees)

186.    Plaintiff Wahl repeats the allegations above as if fully set forth herein.

187.    Under New York law, Wahl and others similarly situated are employees of Defendant Johnson Controls.

188.    Sales Representative employees such as Wahl are required to be paid all monies "earned or payable in accordance with the agreed terms of employment" no less frequently than monthly. N.Y. Lab. Law § 191.

189.    As evidenced by the terms of the incentive compensation plans and Defendant's decades-long agreement with its employees, Defendant both agreed to and had an established policy of paying its salespersons' commission under the terms of the incentive compensation plan in place at the time a sale was made.

190.    Defendant violated that agreement and policy when it wiped out its New York employees' backlogs at the beginning of FY24. Defendant has continuously failed to pay backlogged commissions due as wages under those plans since October 1, 2023.

191.    Under N.Y. Lab. Law § 198, unless the employer provides a good faith basis for non-payment, an employer failing to pay commissions due and owing is liable for the commission owed and liquidated damages equal to one hundred percent of the commission owed and attorney's

fees. The employer is liable for up to three hundred percent of the commissions owed if the withholding was willful.

192.    Johnson Controls willfully, and without a good faith basis, withheld commissions owed to Wahl and those similarly situated. Therefore, Wahl and the New York Sub-Class are entitled to up to three hundred percent of the commissions owed, plus costs and reasonable attorneys' fees incurred in bringing this action.

## COUNT X – INDIANA WAGE CLAIM (Brought by Plaintiff Huntzinger on behalf of a Sub-Class of Indiana Employees)

193.    Plaintiff Huntzinger repeats the allegations above as if fully set forth herein.

194.    Under Indiana law, Huntzinger and others similarly situated are employees of Defendant Johnson Controls.

195.    Indiana employees are entitled to receive as wages "all remuneration," "including but not limited to commissions."  In. Code §§ 22-4-1, 22-4-2.

196.    Employers in Indiana, including Defendant, "shall pay each employee at least semimonthly or biweekly, if requested, the amount due the employee." In. Code § 22-2-5-1.

197.    As evidenced by the terms of the incentive compensation plans and Defendant's decades-long agreement with its employees, Defendant both agreed to and had an established policy of paying its salespersons' commission under the terms of the incentive compensation plan in place at the time a sale was made.

198.    Defendant violated that agreement and policy when it wiped out its Indiana employees' backlogs at the beginning of FY24. Defendant has continuously failed to pay backlogged commissions due as wages under those plans since October 1, 2023.

199.    Under In. Code § 22-2-5-2, as a result of Defendant's violation, Johnson Controls is liable to Plaintiff Huntzinger and the Indiana Sub-Class for the wages due and owing, liquidated

damages in the amount of 10% per day up to double the amount of wages due, plus costs and reasonable attorneys' fees incurred in bringing this action.

<u>**COUNT XI – COLORADO WAGE CLAIM (Brought by Plaintiff Roberts on behalf of a Sub-Class of Colorado Employees)**</u>

200.    Plaintiff Roberts repeats the allegations above as if fully set forth herein.

201.    Under Colorado law, Roberts and others similarly situated are employees of Defendant Johnson Controls.

202.    Colorado employees are entitled to receive as wages "commissions earned for labor or services performed in accordance with the terms of any agreement between an employer and employee. Colo. Rev. Stat. § 8-4-101(14).

203.    Employers in Colorado, including Defendant, must pay all wages due in "regular pay periods of no greater duration than one calendar month or thirty days." Colo. Rev. Stat. § 8-4-103.

204.    As evidenced by the terms of the incentive compensation plans and Defendant's decades-long agreement with its employees, Defendant both agreed to and had an established policy of paying its salespersons' commission under the terms of the incentive compensation plan in place at the time a sale was made.

205.    Defendant violated that agreement and policy when it wiped out its Colorado employees' backlogs at the beginning of FY24. Defendant has continuously failed to pay backlogged commissions due as wages under those plans since October 1, 2023.

206.    Under Colo. Rev. Stat. §§ 8-4-111 and 8-4-109, as a result of Defendant's violation, Johnson Controls is liable to Plaintiff Roberts and the Colorado Sub-Class for earned, vested, and determinable commissions, and a penalty equal to the greater of: the sum of 125% of the amount of such wages up to and including $7,500, and 50% of the amount of such wages and compensation

33

due in excess of $7,500; or the employee's average daily earnings for each day, not to exceed ten days, until such payment or other settlement is made.

207.    Johnson Controls willfully and without a good faith basis withheld commissions owed to Roberts and others similarly situated. As such, the penalty outlined in Paragraph 206 above should be increased by fifty percent.

## COUNT XII – HAWAII WAGE CLAIM (Brought by Plaintiff Garma on behalf of a Sub-Class of Hawaii Employees)

208.    Plaintiff Garma repeats the allegations above as if fully set forth herein.

209.    Under Hawaii law, Garma and others similarly situated are employees of Defendant Johnson Controls.

210.    Hawaii employees are entitled to receive as wages all "compensation for labor or services rendered . . . whether the amount is determined on a time, task, piece, commission, or other basis." Haw. Rev. Stat. § 388-1.

211.    Employers in Hawaii, including Defendant, shall pay "all wages due . . . at least twice during each calendar month, on regular paydays designated in advance." Haw. Rev. Stat. § 388-2.

212.    As evidenced by the terms of the incentive compensation plans and Defendant's decades-long agreement with its employees, Defendant both agreed to and had an established policy of paying its salespersons' commission under the terms of the incentive compensation plan in place at the time a sale was made.

213.    Defendant violated that agreement and policy when it wiped out its Hawaii employees' backlogs at the beginning of FY24. Defendant has continuously failed to pay backlogged commissions due as wages under those plans and under Hawaii law since October 1, 2023.

34

214.    Under Haw. Rev. Stat. §§ 388-10 and 388-11, as a result of Defendant's violation, Johnson Controls is liable to Plaintiff Garma and the Hawaii Sub-Class for the amount of wages due and owing, an additional amount equal to the amount of unpaid wages, and interest accruing at a rate of 6% per year from the date the wages were due, costs and reasonable attorneys' fees incurred in bringing this action, and a penalty of $100 per violation to be deposited in the labor law enforcement special fund.

## **PRAYER FOR RELIEF**

WHEREFORE, the Named Plaintiffs, on behalf of themselves and all others similarly situated, request that judgment be entered in their favor and against Defendant Johnson Controls as follows:

A.    An Order certifying this matter as a Class Action pursuant to Fed. R. Civ. P. 23 on behalf of a nationwide class of commissioned salespersons employed by Defendant at the time of the transition from the FY23 to FY24 Commission Sales Incentive Plan, along with sub-classes of employees grouped by state for Counts IV-XII; appointing the Named Plaintiffs as class representatives for the Class and any Sub-Classes; and that notice of the pendency of this action be provided to members of the Class;

B.    An order awarding the Named Plaintiffs and the Class actual damages in an amount to be proven at trial based on Johnson Controls' breach of contract and breach of the covenant of good faith and fair dealing;

C.    An Order providing relief in favor of the Named Plaintiffs and the Class in the amount of the benefits received by Johnson Controls and by which Johnson Controls was unjustly enriched;

D.     Providing declaratory relief finding that Johnson Controls is required to pay commissions to the Named Plaintiffs and the Class going forward in accordance with the terms of the Parties' agreement and course of dealing, as set forth in the Commission Sales Incentive Plan under which the commissioned salespersons sold Defendant's products and services;

E.     An Order awarded all statutory relief requested on behalf of the sub-classes in Counts IV-XII;

F.     For pre- and post-judgment interest; and

G.     For such other and further relief as the Court deems just and proper under the circumstances.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs hereby demand a jury trial on all causes of action and claims with respect to which they have a right to trial by jury.

Dated: February 8, 2024

**HKM EMPLOYMENT ATTORNEYS LLP**

*/s/ Kevin A. Todd*
John J. Ziegelmeyer III, WIED No. 59042
jziegelmeyer@hkm.com
Brad K. Thoenen, WIED No. 59778
bthoenen@hkm.com
Kevin A. Todd, WIED No. 73048
ktodd@hkm.com
1501 Westport Road
Kansas City, Missouri 64111
816.875.9339

and

36

**HAWKS QUINDEL S.C.**

Summer H. Murshid SBN 1075404
Larry A. Johnson, SBN 1056619
5150 North Port Washington Road
Suite 243
Milwaukee, WI 53217
Telephone: (414) 271-8650
Fax: (414) 207-6079
smushid@hq-law.com
ljohnson@hq-law.com

ATTORNEYS FOR PLAINTIFFS